962 P.2d 813 (1998)
136 Wash.2d 300
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Stephen C. HASKELL, Attorney at Law.
No. 07832-7.
Supreme Court of Washington, En Banc.
Argued May 20, 1998.
Decided September 10, 1998.
*814 Washington State Bar Association, Joy McLean, Seattle, for Petitioner.
Kurt M. Bulmer, Seattle, for Respondent.
ALEXANDER, Justice.
Stephen C. Haskell has appealed the Washington State Bar Association (WSBA) Disciplinary Board's findings that he committed *815 several acts of misconduct and its recommendation that he be disbarred for the misconduct. He contends on appeal that: (1) the WSBA did not prove the alleged misconduct by a clear preponderance of the evidence; (2) the hearing process was tainted by the appointed hearing officer's excessive involvement in the prosecution of the case; and (3) the recommended sanction of disbarment is too extreme given the misconduct found. We hold that the evidence meets the appropriate evidentiary standard and that the hearing process was not tainted by any misconduct on the part of the hearing officer. We conclude, however, that the recommended penalty is too extreme considering the misconduct and other factors relevant to a determination of the penalty and, accordingly, impose a two-year suspension from the practice of law.

THE CHARGES
Haskell was admitted to the Washington State Bar in 1977. He went into the practice of law in Spokane and eventually became a shareholder in the Spokane law firm of Chase, Haskell, Hayes & Kalamon. In 1996, the WSBA filed a formal complaint charging Haskell with eight counts of attorney misconduct. The charges against Haskell arose out of conduct that occurred after 1991 and while he was associated with the aforementioned law firm. Haskell denied the misconduct.

THE HEARING
Following appointment of a hearing officer, a nine-day hearing ensued. During the course of the hearing, Haskell objected to the hearing officer becoming "an advocate on behalf of the Association's positions" in conducting an examination of a witness. Report of Proceedings (RP) at 1253. He later moved for a mistrial, citing what he contended was the "hearing examiner's participation." RP at 1256. His motion was denied.
At the conclusion of the hearing, the hearing officer entered findings of fact and concluded that Stephen C. Haskell had committed seven of the charged counts of misconduct.[1] The hearing officer transmitted these findings to the Board with a recommendation that Haskell be disbarred. The following recitation of facts relating to the acts of misconduct found by the hearing officer are largely taken from the extensive findings of fact entered by the hearing officer.

I.

Counts I & IIInitial-Switching
In counts I and II of the complaint, the WSBA alleged that Haskell had caused billing statements to be mailed to clients which were deceptive in that they indicated that Haskell had performed legal work that had actually been performed by lower-paid associates at his firm and that, as a result, clients were billed for greater sums than they would have been had the deception not occurred. The hearing officer found in this regard that Haskell was hired by State Farm Insurance Company, Continental Loss Insurance Company, USAA Property & Casualty Insurance, and Allstate Insurance Company to represent their insureds in various lawsuits that had been commenced against the insureds. Bills for services performed by Haskell in connection with these cases were to be paid by the insurance companies. Pursuant to Haskell's instructions on some of the billing statements that were sent to these companies, Haskell's initials and billing rate were substituted for the initials of associates in his office who had actually performed the legal work identified on the bills. The hearing officer found that this occurred on billings relating to seven different cases and that it affected a total of eleven bills. The hearing officer also found that the associates who performed the legal work for which Haskell took credit ordinarily billed their time at a lower rate than Haskell,[2] and that the initial-switching, therefore, resulted in the clients *816 collectively being overcharged in the amount of $3,136.85.
The findings indicate that before bills were sent to clients, draft bills were printed for Haskell's review. In the 11 instances noted above, Haskell either inserted his initials on the draft bill in place of the initials of associates who had performed the legal work or instructed staff to do so. Although he gave instructions to his office staff that associates should be given internal credit for the time they worked on such cases, the final bills that were mailed to clients contained only Haskell's initials. In addition, on several occasions, Haskell sent these insurers status reports that had been prepared by associates for his signature. These reports summarized the legal work that had been performed in cases assigned to Haskell and indicated or implied that Haskell had performed legal work that had actually been provided by an associate.
The hearing officer also found that the aforementioned insurance companies expected Haskell to personally perform the legal work on the cases that had been assigned to him. Representatives of Continental Loss and Allstate testified in that regard that they expected Haskell to personally take the depositions of plaintiffs and key witnesses. State Farm and USAA representatives indicated that Haskell was the only attorney who was authorized to work on the cases assigned to him and that he was expected to take all depositions, make arguments at hearings, and present cases at arbitration, mediation, or trial. Although State Farm and USAA representatives indicated that they understood that clerical work would be done by other persons in Haskell's law firm, they said that they wished to approve, in advance, the involvement of any other attorney in the case. The hearing officer found that Haskell was aware of State Farm and USAA's expectations that he personally work on each of the cases assigned to him.
The hearing officer found that Haskell's motivation in switching initials on bills was not financial gain, but rather to retain the insurance companies as clients. Nevertheless, the hearing officer determined that the aforementioned conduct constituted a violation of Rules of Professional Conduct (RPC) 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation); RPC 1.4(b) (lawyer must communicate with client); and RPC 1.5(a) (fee must be reasonable). He concluded, therefore, that Haskell was subject to discipline under Rules for Lawyer Discipline (RLD) 1.1(a) and RLD 1.1(i).[3]

II.

Counts III-VITravel Invoices
In counts III through VI of the WSBA's complaint, Haskell was charged with conducting a scheme whereby he falsely represented to a client, Farmers Insurance Company (Farmers), that he had flown coach class rather than the more expensive first class when he traveled on business for Farmers and, as a result, obtained greater reimbursement from Farmers than he was entitled to receive. The hearing examiner found in this regard that beginning in 1990, Farmers informed Haskell that it would reimburse him only for coach class airfare and would no longer compensate him for first class tickets when he traveled for that company. In 1991, Farmers began requiring Haskell to provide receipts as documentation when he sought reimbursement for airfare. Despite these admonitions from Farmers, on at least 11 occasions Haskell flew first class while conducting business for Farmers.
Haskell, according to the findings, was able to conceal the fact that he traveled first *817 class on these occasions through the assistance of a travel agency. On the 11 occasions described above, the agency sent Haskell two invoices with the airline tickets he purchased. One invoice showed that the ticket Haskell had purchased was for coach class, and the other reflected that the ticket was for first class travel. The ticket price set forth on both invoices represented the cost of first class travel. Haskell presented Farmers with the invoice which indicated that he had purchased a coach class ticket and obtained reimbursement for the amount indicated thereon.
The findings also indicate that on three other occasions, Haskell directed his staff to purchase lower-priced, excursion fare, coach tickets from the travel agency and to send an invoice to Farmers indicating that he had paid the full-fare, coach price. Haskell used the excess amount of money paid to him by Farmers to pay for his and his wife's personal expenses during these trips.
The hearing officer determined that this conduct violated RPC 8.4(a) (attempted violation of RPC 8.4(c)); RPC 8.4(b) (criminal act that reflects adversely on a lawyer's honesty or trustworthiness) through a violation of RCW 9A.56.030 (theft in the first degree) and violation of 18 U.S.C. § 1341 (mail fraud); RPC 8.4(c); RPC 1.4(b); and RPC 5.3(c) (responsibilities regarding nonlawyer assistants). He concluded that Haskell was, therefore, subject to discipline under RLD 1.1(a), RLD 1.1(i), and RLD 1.1(o).[4]

III.

Count VIIIPersonal Expenses
Haskell was charged in count VIII with improperly charging personal expenses to clients. The hearing officer found that in 1992 Haskell was in the process of building a cabin near Coeur d'Alene, Idaho. Haskell, according to the findings, instructed an assistant at his firm, Penny Lindstrom, to bill certain clients for telephone calls that she made for Haskell regarding the cabin. Haskell also instructed Lindstrom to "bury" charges for copies of blueprints for the cabin in a client's bill. Despite the fact that the charges to clients for these personal expenses totaled approximately $40.00 and were, according to the hearing officer, "de minimus in light of the total amount billed to the client," the hearing officer concluded that "that does not diminish the fact that Mr. Haskell's conduct was deceitful and dishonest." Findings of Fact 180 at 20.
The hearing officer held that this conduct constituted violations of RPC 8.4(b); RPC 8.4(c); and RPC 1.5(a), and that Haskell was, thus, subject to discipline under RLD 1.1(a) and RLD 1.1(i).

THE BOARD
After the hearing officer's findings were transmitted to the Board, Haskell requested a hearing before the Board. Following the requested hearing, the Board unanimously adopted the hearing officer's findings of fact and conclusions of law. By a vote of 10-1 the Board recommended to this court that Haskell be sanctioned by disbarment.[5] RLD 6.1. Haskell then appealed to this court pursuant to the provisions of RLD 7.2.

ISSUES
I. Were the charges against Haskell proven by a clear preponderance of the evidence by the WSBA?
II. Did the hearing officer become so involved in the prosecution of the case that the hearing process became tainted, or gave the appearance of being unfair?
III. Is the punishment of disbarment proportionate to Haskell's misconduct?

*818 I.
Pursuant to RLD 4.11(b), counsel for the WSBA has the burden of establishing an act of misconduct by a clear preponderance of the evidence. A clear preponderance of the evidence is an intermediate standard of proof:
requiring greater certainty than `simple preponderance' but not to the extent required under `beyond reasonable doubt.' This intermediate standard reflects the unique character of disciplinary proceedings. The standard of proof is higher than the simple preponderance normally required in civil actions because the stigma associated with disciplinary action is generally greater than that associated with most tort and contract cases. Yet because the interests in protecting the public, maintaining confidence, and preserving the integrity of the legal profession also weigh heavily in these proceedings, the standard of proof is somewhat lower than the beyond reasonable doubt standard required in criminal prosecutions.
In re Discipline of Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). This court will not disturb a hearing officer's findings of fact if they are supported by a clear preponderance of the evidence. In re Discipline of McMullen, 127 Wash.2d 150, 896 P.2d 1281 (1995). While the hearing officer's findings are not conclusive, they are entitled to great weight, particularly "when the credibility and veracity of witnesses are at issue." Allotta, 109 Wash.2d at 793-94, 748 P.2d 628.
In support of his general assertion that the WSBA did not prove its case by a clear preponderance of the evidence, Haskell assigns error to 68 of the hearing officer's 181 findings of fact. He fails, however, to assail any specific finding of fact in the argument portion of his brief. His argument on the sufficiency of the evidence issue essentially consists of a general assertion that the burden of proof was not met with regard to the alleged travel scheme, the alleged burying of personal expenses in clients' bills, and the alleged expectations of the insurance companies that Haskell would personally handle all legal matters. Haskell supports this argument by setting forth his own version of the facts in detail with references to the record.[6]
As we observed recently in In re Estate of Lint, 135 Wash.2d 518, 531-32, 957 P.2d 755 (1998), an appellant's brief is insufficient if it contains merely a recitation of the facts that are most favorable to the appellant. It is incumbent on counsel for the appellant to present argument to the court why specific findings of fact "are not supported by the evidence and to cite to the record to support that argument." Lint, 135 Wash.2d at 532, 957 P.2d 755; see RAP 10.3. Haskell has not done this.
For his failure to observe the Rules of Appellate Procedure, we could conclude simply that the hearing officer's findings, which were adopted in their entirety by the Board, are verities and decline to address Haskell's challenge to the evidence. However, in light of this court's exclusive responsibility to administer the lawyer discipline system, and in recognition of the fact that the Board has recommended the most serious sanction, disbarment, we will endeavor, notwithstanding the procedural shortcomings, to address Haskell's claim that the WSBA failed to prove the misconduct by a clear preponderance of the evidence.[7]
Haskell first asserts that the WSBA "failed to prove by a clear preponderance of the evidence that Mr. Haskell directed and participated in a scheme to provide phoney invoices to Farmers Insurance in order to secretly bill for first class air travel." Assignment of Error 1, Opening Br. of Resp't at 1. In connection with this assertion, he *819 assigns error to 39 of the hearing officer's findings of fact and 8 of his conclusions of law.
Haskell's argument in this regard essentially boils down to an assertion that, while the double-invoicing may have gone on, he had no knowledge of the system. While Haskell testified that he did not knowingly engage in the alleged scheme, his testimony was contradicted by substantial documentary evidence and testimony of his former secretary, former legal assistant, the law firm's office manager, and three of his former law partners. Although Haskell assails the testimony of the various witnesses as being driven by various bad motives, the hearing officer was better able than are we to judge the veracity of these witnesses. See McMullen, 127 Wash.2d at 162, 896 P.2d 1281.
Haskell also claims that the WSBA failed to prove by a clear preponderance of evidence "that Mr. Haskell directed his staff to `bury' certain phone call charges and blueprint charges on charges to other clients." Assignment of Error 2, Opening Br. of Resp't at 2. In connection with this assignment of error, he assigns error to four of the hearing officer's findings of fact and five of his conclusions of law.
Haskell's argument in support of this assertion is very sparse, comprising less than 1 page of his 47-page brief. He says merely that the credibility of Ms. Lindstrom (Haskell's former legal assistant) and Ms. Skobalski (Haskell's former secretary), the witnesses who testified that he told them to do this, is "unreliable" and that he "denied telling anyone to `bury' anything." Opening Br. of Resp't at 28. He attempts to buttress this argument by suggesting that because the amount of these charges was "trivial," why would he "risk everything he had worked so hard for to `bury' some 80 cent phone calls?" Opening Br. of Resp't at 28.
Again, there was a dispute in the testimony. Even in the face of Haskell's novel argument that his testimony is entitled to greater credibility because the amount of money involved was trivial, we are inclined to accept the hearing officer's resolution of the factual dispute.
Finally, Haskell claims that the WSBA "failed to prove by a clear preponderance of the evidence that each of the insurance companies expected Mr. Haskell to personally handle all of their matters and that Mr. Haskell knowingly participated in sending letters to insurance companies to trick them into thinking that he had done the work." Assignment of Error 4, Opening Br. of Resp't at 2. In connection with this assignment of error, Haskell assigned error to 25 of the hearing officer's findings of fact.
His argument on this issue is even briefer than the preceding. He says essentially that the insurance companies "would have known that Mr. Haskell would use associates as he felt necessary" and that he "testified specifically to this effect." Opening Br. of Resp't at 29. Unfortunately for Haskell, his testimony was refuted by much documentary evidence, the testimony of insurance company representatives, and the testimony of employees of Haskell's former firm. We cannot say that the hearing officer, faced with this conflicting evidence, erred in resolving the conflict in favor of the WSBA and, in finding in this regard, that the evidence was not of sufficient weight to meet the appropriate evidentiary standard.

II.
Haskell asserts that the hearing officer became so involved in the prosecution of the case that the proceeding was unfair or appeared unfair. Specifically, he contends that the hearing officer erred in "entering the fray on the side of the prosecutor" and "stepped out of his role as judicial officer." Assignment of Error 5, Opening Br. of Resp't at 3, 31. This should not surprise us, Haskell's counsel suggests, because of Washington's use of volunteer hearing officers who generally "have no judicial experience" and, thus, are more likely to "step outside the boundaries dictated by that role." Opening Br. of Resp't at 32.
While we do not agree with Haskell's counsel that the use of volunteer hearing officers is a weak link in the disciplinary process, we do agree with his contention that Haskell was entitled to a hearing before a *820 hearing officer who was not only fair, but appeared to be fair. Brister v. Council of City of Tacoma, 27 Wash.App. 474, 619 P.2d 982 (1980), review denied, 95 Wash.2d 1006 (1981). In determining if a proceeding appears to be fair, the critical concern is how it would appear to a reasonably prudent and disinterested person. See Chicago, Milwaukee, St. Paul, & Pac. R.R. Co. v. Human Rights Comm'n, 87 Wash.2d 802, 557 P.2d 307 (1976).
Haskell calls to our attention two instances of conduct on the part of the hearing officer which, he argues, demonstrate actual bias by the hearing officer and an appearance of unfairness.[8] These alleged flaws in the hearing process, Haskell contends, justify a new hearing for Haskell.
Haskell first calls our attention to the hearing officer's questioning of Judith Martin, the owner of the travel agency which provided Haskell with double invoices. Martin testified at the hearing that the sending of two invoices was a common practice in the travel industry and that there were valid reasons for requests for double invoices. She also indicated that she had never spoken to Haskell regarding the arrangement for two invoices. After the WSBA's counsel and counsel for Haskell had questioned Martin, the hearing officer proceeded to question Martin, asking her why she would prepare two invoices for her clients, one which was correct and one that contained "false information," and "how [she] could envision that to be proper." RP at 1245-48. Haskell characterizes the hearing officer's conduct in questioning Martin as a "commen[t] on the evidence" and suggests that the hearing officer proceeded to "grill her about why she would allow false invoices." Opening Br. of Resp't at 35, 37. Haskell took particular umbrage at the hearing officer's use of the term "false documents" in his questioning as "thought [sic] this was a proven fact." Opening Br. of Resp't at 35. Haskell contends, additionally, that the hearing officer "argued with the witness, made snide remarks and took on the role of advocate." Opening Br. of Resp't at 35.
The WSBA responds that the hearing officer's questioning of Martin did not reveal any bias against Haskell or deprive him of a fair hearing. While the WSBA acknowledged the hearing officer's concession that he examined Martin with "force," it suggests that it was not improper for the hearing officer to do so in light of the fact that the hearing officer was "apparently troubled" by Martin's testimony that there was nothing unusual about issuing invoices that contained incorrect information. Answering Br. of WSBA at 28.
The second alleged instance of bias concerned a request by the hearing officer that a witness, Patricia Froemming, retrieve some accounting records relating to travel expenses and allocation of charges for personal expenses. Froemming, who was the bookkeeper for Haskell's law firm, produced records in response to the hearing officer's request and these records were admitted into evidence. Haskell asserts that it is not the role of the hearing officer to generate evidence and that this action interjected the hearing officer into the role of advocate, or, at a minimum, gave the appearance that he had become involved in the case and in the "process of the creation of evidence for his own consideration." Opening Br. of Resp't at 42.
The WSBA counters that Haskell failed to object at the time the hearing officer requested that Froemming obtain certain records or when the records were introduced into evidence. It asserts that "[a] party cannot appeal a ruling admitting evidence unless the party makes a timely and specific objection to the admission of the evidence." State v. Avendano-Lopez, 79 Wash.App. 706, 710, 904 P.2d 324 (1995), review denied, 129 Wash.2d 1007, 917 P.2d 129 (1996). The WSBA goes on to say that, in any case, it is entirely appropriate for a hearing officer to request that additional evidence be provided. It notes in this regard that this court has held that a trial judge has the discretion to *821 call witnesses on his or her own initiative. Ramsey v. Mading, 36 Wash.2d 303, 310, 217 P.2d 1041 (1950). The WSBA suggests that the hearing officer's request for documents was much less of an intrusion into the prerogative of counsel than the calling of witnesses.
We are satisfied, after reviewing the record here, that the two incidents that Haskell has called to our attention do not reveal that the hearing officer was biased or unfair or that the incidents caused an appearance of unfairness. Both incidents involved the hearing officer's conduct in directing questions to a witness. Haskell cites no authority for the proposition that a hearing officer cannot ask questions of a witness or ask that evidence be produced. We are satisfied that a hearing officer may do so as long as he or she remains fair and impartial. Although one could perhaps be critical of the hearing officer's forceful questioning of Martin on grounds that Martin's failure to recognize the wrongfulness of her practice of issuing invoices containing false information was irrelevant, since the propriety of her conduct was not an issue, the fact that she was questioned about it hardly demonstrates that the hearing officer was biased or that he bore any animus toward Haskell.
Haskell's suggestion that the hearing officer improperly commented on the evidence by referring to the invoice as "false" is entirely without merit. In the first place, the prohibition against commenting on evidence applies only in jury trials. Const. art. IV, § 16. More importantly, there was no dispute about the fact that Martin's agency provided Haskell's law firm with invoices that did not accurately reflect the nature of the tickets that had been purchased. The hearing officer's characterization of the invoice as "false" can, therefore, not be said to indicate bias or prejudice toward Haskell.
Insofar as the other incident is concerned, the record indicates that the hearing officer requested that witness Froemming retrieve documents to help refresh her memory regarding how charges for travel expenses were allocated. In our view, the hearing officer's request to be presented with records about which a witness had testified was a reasonable exercise of his role as a factfinder, particularly in this type of hearing where the rules of evidence are relaxed. RLD 4.11(c).
Finally, we agree with the WSBA that even if the actions of the hearing officer were improper, they were isolated incidents that took place in a lengthy hearing and did not detract from the overall fairness of the proceeding. As it notes, the hearing lasted nine days and it generated over 2,000 pages of transcript. Although there may be instances where a single incident or comment may be sufficient to lead a reasonably prudent person to believe a proceeding is unfair, the two incidents that have been called to our attention are not significant enough, whether viewed in isolation or against the whole record, to justify a new hearing. Malave-Felix v. Volvo Car Corp., 946 F.2d 967, 973 (1st Cir.1991) ("Charges of bias should not be based on a few isolated comments, but rather on the record as a whole.").

III.
Haskell, as we have observed, violated the Rules of Professional Conduct in numerous ways. The WSBA has maintained throughout that he should be disbarred for this misconduct. The hearing officer agreed with the WSBA and recommended that Haskell be disbarred. The Board, by a vote of 10-1, accepted this recommendation. Although we do not lightly depart from the Board's recommendation, we are not bound by it. RLD 2.1; In re Discipline of Noble, 100 Wash.2d 88, 95, 667 P.2d 608 (1983). In the final analysis, this court retains the ultimate responsibility for determining the nature of an attorney's discipline. In re Discipline of Espedal, 82 Wash.2d 834, 838, 514 P.2d 518 (1973).
We will, however, adopt the Board's recommendation on a sanction unless we can articulate a specific reason to depart from the Board's recommendation and we are persuaded that the sanction is inappropriate after consideration of one or more of the following factors:
*822 1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);
2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);
3. The effect of the sanction on the attorney (sanction must not be clearly excessive);
4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and
5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).

In re Discipline of Johnson, 114 Wash.2d 737, 752, 790 P.2d 1227 (1990) (summarizing Noble, 100 Wash.2d at 95-96, 667 P.2d 608).
With these factors in mind we observe that the Board was one vote short of a unanimous recommendation of disbarment. While Haskell makes much of the fact that the dissenter was a lay member of the Board, we are not persuaded that the vote of any one Board member is more or less significant than the vote of any other member. Furthermore, even if we were to attach more importance to votes of lay board members, the significance of the vote pales in the face of the overwhelming vote in favor of disbarment.
The WSBA contends that disbarment of Haskell will fulfill the purposes of attorney discipline (factor one) because it will send a strong message to other attorneys and the public that the type of misconduct displayed by Haskell will not be tolerated. While we agree with that general statement, we also believe that a significant suspension could achieve the same goal and is less likely to be clearly excessive (factor three). Insofar as whether the record developed by the hearing officer is fully supported by the record, it can be fairly said that it supports disbarment or suspension and it does not appear to be based upon considerations outside the record (factor four).
This leads us to considerations of proportionality. In order to maintain consistency in the setting of sanctions for violations of the Rules of Professional Conduct, we have adopted the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (1986). In re Discipline of Curran, 115 Wash.2d 747, 765, 801 P.2d 962, 1 A.L.R.5th 1183 (1990). Pertinent to this consideration, the hearing officer found that the following STANDARDS were applicable:
4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.
4.61 Disbarment is generally appropriate when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious injury or potentially serious injury to a client.
5.11 Disbarment is generally appropriate when:
(a) a lawyer engaged in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
Findings of Fact 190 at 22.
Although not cited by the hearing officer, we note that the STANDARDS also indicate that "[s]uspension is generally appropriate when a lawyer knows or should know that he is *823 dealing improperly with client property and causes injury or potential injury to a client," and that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system." AMERICAN BAR ASS'N, STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 4.12, at 27, std. 7.2, at 45 (1986).
Finally, the court is to examine the appropriate aggravating and mitigating circumstances to better define the sanction. The hearing officer found the following mitigating factors to be present: absence of prior disciplinary record; personal or emotional problems, specifically self-inflicted stress; character or reputation; unavoidable delay in the disciplinary proceedings; and some level of remorse with regard to billings, although very late in the proceeding. He also found the following aggravating factors: dishonest motive; pattern of misconduct; refusal to acknowledge wrongful nature of conduct; and substantial experience in the practice of law.
Haskell argues that disbarment is too extreme for the acts of misconduct he committed. He maintains that while seven acts of misconduct were found, the actual dollar amounts involved are "relatively small." Opening Br. of Resp't at 45. He also stresses that no clients have complained.[9] Finally, he points to the mitigating factors of good character and lack of prior disciplinary record.
The WSBA responds that disbarment is a proportionate sanction. It points to the aggravating factors of multiple acts of misconduct. It also compares Haskell's misconduct to that which was before the court in two other cases: In re Discipline of Saulnier, 97 Wash.2d 676, 648 P.2d 433 (1982), and In re Discipline of Lavery, 90 Wash.2d 463, 466-67, 587 P.2d 157 (1978). Although it concedes that the sanction imposed in each of those cases was less severe than what it recommends here (two-year suspension in Saulnier for a shoplifting conviction and 90-day suspension in Lavery for acts of dishonesty), it suggests that the misconduct in those cases was less significant and that Haskell's conduct, therefore, justifies a harsher sanction.
After considering the entire record, we are inclined to impose a sanction of suspension rather than disbarment. While, arguably, disbarment is a presumptive sanction, we feel it is appropriate here to depart from the recommendation of the Board. In reaching this determination, we have been little-influenced by mitigating and aggravating factors which essentially cancel each other out. Neither do most of the five Noble factors, noted above, assist us greatly. The factor that influences us most significantly is proportionality. Although neither counsel has cited any decision of this court that is close to this case factually, that is understandable since at the time of argument there was no reported decision from this court dealing with initial-switching such as we have here. Since that time, however, we have issued an opinion in an analogous case, In re Discipline of Dann, 136 Wash.2d 67, 960 P.2d 416 (1998). The facts there were that attorney Dann knowingly engaged in initial-switching of the sort engaged in here by Haskell and for essentially the same reasons. It was also clear there that the initial-switching was to the detriment of four clients. We upheld the Board's recommendation that Dann be suspended from the practice of law for one year. In light of our recent decision in Dann, and the fact that the Dann case resembles this case factually, we are of the view that it furnishes an appropriate reason for us to depart from the recommended sanction and impose a maximum suspension of two years. While Haskell might argue that the sanction here should be one year as in Dann, such a contention would overlook the additional misconduct related to his travel for Farmers Insurance, the burying of expenses in client's bills, and the mitigating factors of delay and undue publicity which were present in Dann and absent here. Although Dann did engage in an additional *824 act of misconduct as well,[10] it was not as serious as the additional acts of misconduct on Haskell's part.

CONCLUSION
After reviewing the record, we conclude that the hearing officer's findings of fact that Haskell engaged in conduct that violated the Rules of Professional Conduct are supported by a clear preponderance of the evidence. We also conclude that the hearing was not tainted by the actions of the hearing officer. We hold, however, that the recommended sanction of disbarment is too extreme considering the sanction imposed in a similar case and, thus, we impose the lesser sanction of suspension from the practice of law for two years.
DOLLIVER, SMITH, JOHNSON, TALMADGE and SANDERS, JJ., concur.
NOTES
[1] The hearing officer concluded that the burden of proof had not been met to support count VII, an allegation that Haskell had obtained funds from his law firm by color or aid of deception.
[2] The difference between Haskell's rate and that of the associates varied from $10 to $25 per hour.
[3] RLD 1.1 provides that:

"A lawyer may be subjected to the disciplinary sanctions or actions set forth in these rules for any of the following:
"(a) The commission of any act involving moral turpitude, dishonesty, or corruption, ... whether the same be committed in the course of his or her conduct as a lawyer, or otherwise, and whether the same constitutes a felony or misdemeanor or not; and if the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding shall not be a condition precedent to disciplinary action, nor shall acquittal or dismissal thereof preclude the commencement of a disciplinary proceeding;
"....
"(i) Violation of the Rules of Professional Conduct of the profession adopted by the Supreme Court of the State of Washington."
[4] RLD 1.1 (o) provides that a lawyer may be subjected to the disciplinary sanctions for:

"Attempting to commit an act, or assisting another in committing or attempting to commit an act, which if completed would be prohibited by this rule."
[5] Pio DeCano, II, a citizen member of the Board, dissented from the majority's recommendation that Haskell be disbarred. He stated in his dissent, "Based upon the record, while Respondent's conduct was egregious and deserving of significant discipline, it does not rise to the disbarment level. Therefore, I would recommend that Respondent be suspended for two years." Decision Papers at tab 3.
[6] Haskell did not assign error to many of the hearing officer's findings relating to the alleged initial-switching.
[7] Haskell indicated in assignment of error 3 that the WSBA failed to prove its case "by a clear preponderance of the evidence, much less by the greater standard of proof beyond a reasonable doubt." Opening Br. of Resp't at 2. This no doubt is in response to the hearing officer's finding of fact 3, in which the hearing officer indicated that he was aware that the proper burden of proof was a clear preponderance, but that he applied the higher burden of proof beyond a reasonable doubt in order to resolve any possible doubt "in Mr. Haskell's favor." Finding of Fact 3 at 3.
[8] In his assignments of error, Haskell claims only that the hearing officer erred in denying his motion for mistrial based on the hearing officer's questioning of Judith Martin. In the issue pertaining to that assignment of error and in the body of his brief, he broadens the claim of unfairness.
[9] We have recently rejected this same argument. See In re Discipline of Dann, 136 Wash.2d 67, 79 n. 2, 960 P.2d 416, 420 n. 2 (1998).
[10] Dann also received a reprimand for violating RPC 8.4(c) by "secretly tape recording a telephone conversation with another attorney and, unbeknownst to that attorney, allowing a party interested in the topic of conversation to listen in." Dann, 136 Wash.2d at 76, 960 P.2d at 419.